AUSA: Sara Woodward  Telephone: (313) 226-9180
Agent: Shanika Sanders  Telephone: (313) 226-2573

AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Eastern District of Michigan

United States of America

v.

MUGAIRAH ABDUL-SALAAM

Case No. Case: 2:21-mj-30541
Judge: Unassigned,
Filed: 11-12-2021 At 06:54 PM
USA v. SEALED MATTER (CMP)(MLW)

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 27, 2020 - December 31, 2020 in the county of Wayne in the Eastern District of Michigan, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1341 | mail fraud |
| 18 U.S.C. § 1343 | wire fraud |
| 18 U.S.C. § 1028A | aggravated identity theft |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

*Complainant's signature*

Shanika Sanders- Special Agent
*Printed name and title*

Sworn to before me and signed in my presence and/or by reliable electronic means.

Date: November 12, 2021

City and state: Detroit, MI

*Judge's signature*

Anthony P. Patti - U.S Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MUGAIRAH ABDUL-SALAAM<br>Defendant | Case No.  Case: 2:21-mj-30541<br>Judge: Unassigned,<br> Filed: 11-12-2021<br>USA v. SEALED<br>MATTER (CMP)(MLW) |

**Filed Under Seal**

### AFFIDAVIT IN SUPPORT OF
### A CRIMINAL COMPLAINT

I, Shanika Sanders, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a criminal complaint charging the above individual with mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and aggravated identity theft (18 U.S.C. § 1028A).

2. I am a Special Agent (SA) of the U.S. Department of Labor, Office of Inspector General (DOL/OIG), and have been so employed since January 2016. Prior to this assignment, I was employed as an investigator in Industry Operations for the Bureau of Alcohol, Tobacco, Firearms and Explosives for three years. I am currently assigned to the Detroit Field Office of DOL/OIG.

3. During my years at the Department of Labor, I have conducted numerous investigations into criminal violations of both Title 29 and Title 18 of the United

States Code. During this time, I have been either the lead agent or supporting agent on several investigations involving criminal schemes targeting the State of Michigan's (SOM) Unemployment Insurance Agency (UIA) through the filing of false or fictitious unemployment insurance (UI) claims. Based on my direct personal experience with these cases, I have become familiar with the methods that criminals use to attack and exploit the UI systems, as well as tools and methods criminals often utilize to facilitate that fraud.

4.     This affidavit is being submitted for the limited purpose of showing that there is sufficient probable cause for the requested criminal complaint and arrest warrant and does not set forth all my knowledge about this matter. The information stated below is based upon my personal observations as well as information received from State of Michigan Fraud Investigators, special agents of the United States Secret Service (USSS), and other reliable sources.

5.     This investigation concerns false and fraudulent unemployment insurance (UI) claims filed in relation to the COVID-19 pandemic. As described below, MUGAIRAH ABDUL-SALAAM has conspired to obtain money or property by means of false and fraudulent pretenses and representations, facilitated using interstate wire communications.

**BACKGROUND ON PANDEMIC UNEMPLOYMENT ASSISTANCE**

6.      State unemployment systems and benefits are joint state and federal enterprises largely financed by taxes on private employers located in that state. When state unemployment benefits are exhausted, they may be supplemented by federal funds appropriated by the U.S. DOL.

7.      On March 18, 2020, the Families First Coronavirus Response Act ("FFCRA") was signed into law. The FFCRA provides additional flexibility for state UI agencies and additional administrative funding to respond to the COVID-19 pandemic. Then, the Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. It expands states' ability to provide assistance to many workers impacted by COVID-19, including for workers who are not ordinarily eligible for UI benefits. The CARES Act provided for three new temporary UI programs: Pandemic Unemployment Assistance ("PUA"); Pandemic Emergency Unemployment Compensation ("PEUC"); and Federal Pandemic Unemployment Compensation ("FPUC").

8.      The first program, PUA, initially provided for up to 39 weeks of benefits to individuals who are: (1) self-employed, seeking part-time employment, or otherwise would not qualify for regular UI or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act; and (2) unemployed, partially unemployed, unable to work, or unavailable to work due to specific COVID-19 related reason(s). Coverage includes individuals who have exhausted

3

all rights to regular UC or extended benefits under state or federal law or PEUC. Under the PUA provisions of the CARES Act, business owners, self-employed workers, independent contractors, or gig workers can qualify for PUA benefits administered by the State of Michigan Unemployment Insurance Agency (SOM-UIA) if they previously performed such work in Michigan and are unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19 related reason. PUA claimants must answer specific questions to establish their eligibility for PUA benefits. Claimants must provide their name, Social Security Number, and mailing address and self-certify that they meet one of the COVID-19 related reasons for being unemployed, partially unemployed, or unable or unavailable to work. Initially, the eligible timeframe to receive PUA was from weeks of unemployment beginning on or after January 27, 2020 through December 31, 2020.

9.      The second program, PEUC, initially provided for up to 13 times the individual's average weekly benefit amount to individuals who have exhausted regular UI under state or federal law, have no rights to regular UI under any other state or federal law, are not receiving UI under the UI laws of Canada, and are able to work, available for work, and actively seeking work. However, states must offer flexibility in meeting the "actively seeking work" requirement if individuals are unable to search for work because of COVID-19, including because of illness,

quarantine, or movement restriction. The eligible timeframe to receive PEUC was from weeks of unemployment beginning after the respective state has an established agreement with the federal government through December 31, 2020. The earliest being April 5, 2020.

10. The third program, FPUC, provides individuals who are collecting regular UI, PEUC, PUA, and several other forms of UC with an additional $600 per week. The eligible timeframe to receive FPUC was from weeks of unemployment beginning after the respective state had an established agreement with the federal government through July 31, 2020. The earliest being April 5, 2020.

11. On August 8, 2020, after FPUC expired, a Presidential Memorandum authorized the Federal Emergency Management Agency ("FEMA") to use disaster relief funds pursuant to Section 408, Other Needs Assistance, of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. §§ 5121-5207, to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19. The Lost Wages Assistance Program ("LWA") served as a temporary measure, if SWAs chose to administer it, to provide an additional $300 per week via a total of approximately $42.5 billion in FEMA funds. The period of assistance for LWA was August 1, 2020 to December 27, 2020, or termination of the program, whichever was sooner.

12. Then, on December 27, 2020, the Consolidated Appropriations Act, 2021—an omnibus spending bill that included an estimated additional $200 billion in funding for pandemic related UI programs — was signed into law. Through a section titled the Continued Assistance for Unemployed Workers Act of 2020 ("Continued Assistance Act"), Congress extended and modified the three temporary UI programs created by the CARES Act and created a new benefit program.

13. First, it increased the duration and availability of both PEUC, which provides benefits to individuals who have exhausted their state unemployment benefits, and PUA, which provides unemployment compensation to independent contractors and others unable to access traditional UI benefits. Specifically, the Continued Assistance Act extended PEUC and PUA through March 14, 2021. Additionally, the duration of PUA benefits for eligible individuals was effectively extended from 39 weeks under the CARES Act to a total of 50 weeks; the amount of PEUC benefits for eligible individuals was extended from 13 to 24 times the individual's average weekly benefit amount. FPUC was reauthorized at a lesser amount of $300 per week for weeks of unemployment beginning after December 26, 2020 through March 14, 2021. FPUC benefits remain unavailable for the gap between its expiration in the CARES Act (July 31, 2020) and its reauthorization in the Continued Assistance Act (December 26, 2020).

14. Second, the Continued Assistance Act created a new optional program, Mixed Earner Unemployment Compensation ("MEUC"), which SOM-UIA opted to not administer. The MEUC program provides eligible individuals with an additional $100 payment each week, in addition to the FPUC payment. To be eligible, an individual must: (1) have received at least $5,000 of self-employment income in the most recent taxable year prior to the application for regular UC; (2) be receiving a UI benefit other than PUA for which FPUC is payable; and (3) submit documentation substantiating their self-employment income. Individuals receiving PUA are not eligible. MEUC is payable beginning with weeks of unemployment no earlier than the week ending January 2, 2021 through the week of unemployment ending on or before March 14, 2021.

15. On March 11, 2021, as the relief benefits authorized by the Continued Assistance Act were about to expire, the President signed the American Rescue Plan Act of 2021, which included an estimated $203 billion in additional relief, including reauthorization of PUA, FPUC, PEUC, and MEUC. Under the American Rescue Plan Act, PUA and PEUC were extended, without interruption, to weeks of unemployment ending on or before September 6, 2021, thereby allowing eligible individuals to collect PUA and PEUC benefits for an additional 29 weeks (79 weeks total for PUA and 53 times the individual's average weekly benefit amount for PEUC). However, there are 25 weeks between the week ending March 13,

2021 and the last payable week of September 4, 2021, making it unlikely that individuals would exhaust their full entitlement before the two programs expire. Additionally, the $300 FPUC benefit was extended through September 6, 2021. The MEUC program was also extended through September 6, 2021 for SWAs choosing to administer it.

16. Regardless of which of the three programs described above was involved (that is, whether PUA, PEUC, or FPUC), funds were distributed to program participants by SOM-UIA. These funds were received by the SOM-UIA from the United States Department of the Treasury (Treasury) through Treasury's program entitled Automated Standard Application for Payments, commonly referred to as "ASAP." ASAP is an electronic system that federal agencies use to securely transfer money to recipient organizations. Federal agencies enroll recipient organizations, authorize their payments, and manage their accounts. Recipient organizations then request payments from these pre-authorized accounts. Recipient organizations may include state and local governments, educational and financial institutions, vendors and contractors, profit and non-profit entities, and Indian tribal organizations. ASAP is free for both federal agencies and recipient organizations.

17. When the SWA for which the account was funded was ready to receive the funds, the SWA would make a payment request using the ASAP web interface, and

Treasury would then disburse the funds to the SWA's bank account for the SWA's use. The flow of funds from the ASAP account to the SWA's bank account always occurs in one of two electronic payment methods: an Automated Clearinghouse payment, commonly referred to as an "ACH," or by another electronic service operated by the Federal Reserve Bank (FRB) system called Fedwire. Whether the flow of funds from the ASAP account to the SWA's bank account was done by ACH or by Fedwire, there are certain steps along the way that need to occur.

18.     The origin of the payment to the SOM-UIA's bank account from the SOM-UIA's ASAP account originates from wherever the SOM-UIA made the request for payments, which generally occurs where SOM-UIA is located. Once the SPM-UIA makes this request, the Treasury Web Applications Infrastructure (commonly referred to as the TWAI) routes the funds through one of two Operations Centers, either the Dallas Operations Center (DOC) located in Dallas, Texas, or the East Rutherford Operations Center (EROC) located in East Rutherford, New Jersey. The payment path always includes routing through one of these two centers for processing. If it is an ACH payment, the payment generally passes through the ACH Clearinghouse, also known as The Clearing House, in Atlanta, Georgia. Alternatively, if the ASAP payment is being made as a Fedwire payment, the payment path typically passes through the FRB New York's Clearinghouse, located at the EROC in New Jersey. Whether the SOM-UIA's bank account is

located in the same state, or elsewhere, the funds would have necessarily flowed through the facilities described above prior to arriving in the SOM-UIA's bank account.

19. According to data maintained by the U.S. Department of Labor—Employment and Training Administration, State Workforce Agencies (SWA), like the SOM-UIA, requested and received approximately $427 billion in CARES Act funding related to PUA, FPUC, and PEUC benefit payments. In total, it is estimated that as of September 2021, the federal government's response to the COVID-19 pandemic will have included approximately $872.5 billion in pandemic related UI funding for SWAs to administer for individuals who have been impacted by COVID-19.

## **SUMMARY**

20. There is probable cause to believe that MUGAIRAH ABDUL-SALAAM willfully committed both mail and wire fraud; that is, obtained money or property through the submission of false and fraudulent UI claims, the processing and payment of which involved both the use of the mail and interstate wire transmissions. Further, MUGAIRAH ABDUL-SALAAM made use of the personal identifying information (PII) of multiple individuals during and in relation to the scheme to defraud and obtain money or property.

21.    As set forth below, the investigation has revealed that MUGAIRAH ABDUL-SALAAM is responsible for the submission of sixteen (16) fraudulent UI claims using stolen PII. As a result of the fraudulent claims, the State of Michigan UIA has paid out approximately $79,473, and the State of Nevada has paid out approximately $23,700, for a total loss of $103,173.

22.    Multiple UI claims have been linked together based upon bank accounts belonging to MUGAIRAH ABDUL-SALAAM. Thirteen (13) of the sixteen (16) UI claims were deposited onto debit cards, which belonged to MUGAIRAH ABDUL-SALAAM. Three (3) fraudulent UI claims were denied, and no funds were released. The fraudulent UI claims were also linked based upon other claim attributes such as the bank accounts' mailing addresses, phone numbers and email addresses.

## INVESTIGATION

23.    In May 2020, a postal inspector at the United States Postal Inspection Service (USPIS) in Detroit picked up approximately 100 SOM-UIA mailings addressed to a variety of names at 20175 Santa Barbara in Detroit. Your affiant checked the address with the SOM-UIA and learned that 350 UI claims were filed using that address for a total of up to $250,000 in claims. During the course of this investigation, it was determined that ABDUL-SALAAM was one of many subjects behind this unemployment insurance (UI) fraud scheme.

24.   On May 6 and May 7, 2020, three fraudulent UI benefit claims were filed in the State of Michigan in the names of "D.M." for $4,280, "K.S.", and "J.C." for $4,120.00 each.[1] On May 19, 2020, the State of Michigan UIA approved the claims and the funds were subsequently deposited into a Chime bank account ending -8414. The name on the bank account was MUGAIRAH ABDUL-SALAAM, and the phone number for the account, ending in -9214, is associated with ABDUL-SALLAM. In addition, the SSN, address, and email account associated with the Chime bank account all belonged to ABDUL-SALAAM. The Chime debit card associated with the -8414 account was sent through the U.S. mail.

25.   On May 4, and May 8, 2020, two fraudulent UI benefit claims were filed in the State of Michigan in the names of "F.M." for $ 14,893, and "D.O." for $5,800. On May 6, and May 12, 2020, the State of Michigan UIA approved the claims and subsequently deposited the funds into a Sutton Bank account ending in -8622. The Sutton Bank account provides a Visa debit card for use by Square (Cash App). The name on this account was MUGAIRAH SALAAM, and the address provided is

---

[1] The full names for the claims referenced in this paragraph and throughout the complaint are known to your affiant but not included in this publicly filed complaint to protect potential victims of identity theft.

also associated with ABDUL-SALAAM. The Visa debit card associated with the -8622 account was sent through the U.S. mail.

26. On October 12, 2021, investigators contacted "D.O.", who now goes by "D.E.", and she said that she did not file a UI claim. "D.E" has been retired for many years, and was not out of work due to the pandemic. "D.E." confirmed the SSN and DOB used to file the fraudulent UI claim belonged to her, but said she was unfamiliar with the physical address or email address used in the filing of the claim and further stated she has never lived in the city of Detroit. "D.E." advised she was aware a UI claim had been filed in her name, due to her income tax refund being less than she expected. "D.E." stated she tried to contact someone about this, and denied providing her information to anyone for the purpose of filing a UI claim. Also, "D.E" denied the use of a Sutton Bank or Cash App account.

27. On June 10 and June 14, 2020, two fraudulent UI benefit claims were filed in the State of Nevada in the names of "S.J." for $8,600 and "T.G." for $15,144. On June 15 and June 26, 2020, the claims were subsequently deposited into a Sutton Bank account ending in -8622, which provides a Visa debit card for Square (Cash App). As stated above in paragraph 25, the name on this account was MUGAIRAH SALAAM and the address provided is also associated with ABDUL-SALAAM.

## CONCLUSION

28.     Based on the forgoing, there is probable cause to believe that MUGAIRAH ABDUL-SALAAM has committed multiple federal crimes, to include mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), and aggravated identity theft (18 U.S.C. § 1028A). These violations stem from an ongoing scheme to defraud federal and state unemployment insurance programs to obtain unemployment benefits, by means of false and fraudulent pretenses and representations. This scheme involved both the wire transmission of signs and signals in interstate commerce and the use of the mails, and the PII of multiple individuals was used during and in relation to the scheme.

Respectfully submitted,

_____
Special Agent Shanika Sanders
Department of Labor-
Office of Inspector General

Sworn to before me and signed in my
presence and/or by reliable electronic means.

_____
Hon. Anthony P. Patti   November 12, 2021
United States Magistrate Judge